## THE FREDENSBORG.

District Court, E. D. New York.
January 27, 1930.

Decree for claimant and respondent.

Finkler & Finkler, of New York City (Frank Finkler, of New York City, of counsel), for libelants.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. D. Potter and J. J. Heckman, both of New York City, of counsel), for claimant.

Rumsey & Morgan, of New York City (Mark W. Maclay and John T. Carpenter, both of New York City, of counsel), for respondent-impleaded.

GALSTON, District Judge.

This libel was filed against the steamer Fredensborg, for damage to a cargo delivered to the steamer at Summerside, Prince Edwards Island, in November, 1925, consisting of 23,696 bags of potatoes for delivery at New York City. It is claimed that by reason of the negligence of the owners, officers, and crew, and others in charge of the steamer, in respect to the loading, stowage, and care of the cargo, and because of the unseaworthiness and deviation of the said vessel on the voyage in question, the potatoes were damaged.

The Munson Steamship Line was impleaded as charterers.

I find that the Fredensborg arrived at Summerside on Sunday, November 8, 1925, and docked at the Canadian government wharf. On her last previous voyage she had carried a cargo of salt. In order to prepare the ship's holds to receive the shipment of libelants' potatoes, the holds and 'tween decks were that afternoon washed (with sea water), then swept and dried by the use of shavings and hay.

There was a representative of the shipper present while the Fredensborg was being prepared to receive the cargo and during the loading thereof. It was he who called attention to the presence of salt in the holds. The stowage was carried on under the superintendence and direction of competent and experienced men. For the drying of the holds after the washing, there were thirty bales of shavings used. The dunnage consisted of 13,360 feet of lumber. The lumber was laid crosswise and lengthwise in each hold, forming a sort of a crib. Over this dunnage was spread a quantity of hay. Vertical dunnage was erected alongside the sides of the holds

and the bulkheads. Between this dunnage and the battens and bulkheads hay was stuffed. In all 9,680 tons of hay were thus used.

In loading the cargo, the bags of potatoes were placed on slings picked up by the ship's boom and conveyed into the holds. It appears that as to the slings as first rigged they were improperly roped, but this condition was promptly corrected.

Although the testimony is somewhat conflicting, I reach the conclusion that the dunnage was adequate and was properly laid, and that the stowage was properly effected; and that the ventilation all that was required.

But the libelants allege, not only improper stowage and handling of the cargo and the use of insufficient dunnage, but also assert that the ship was unseaworthy, in that remains of the salt cargo last carried by the ship affected the potatoes and caused what is known as "salt damage." It was moreover contended that such damage is of a progressive character, and that a deviation caused by either poor quality or insufficient coal compelled the steamer, after having been one hundred miles out, to turn back to Halifax for re-coaling, and that the delay ensuing from the deviation aggravated the damage to the potatoes.

That some potatoes were delivered in a damaged condition is conceded. That the damage arose from any negligence of either the Fredensborg or the charterer is denied.

The testimony shows that the shipment consisted of 2,990,415 pounds of potatoes. From the inspection made by the libelants' witness Putnam, a cargo surveyor, it appears that less than 1 per cent. of the number of potatoes constituting the cargo was physically damaged. From all the testimony given, the maximum amount of damage sustained was 46,820 pounds of potatoes. Of these, 13,920 pounds were left on the dock undelivered to any warehouse, because they were unfit for consumption; and the balance, 32,900 pounds, were found as a result of the warehouse inspection to be defective.

Libelant Balish testified that mechanical injuries to potatoes, which do not exceed 2 per cent. of the shipment, are not considered damage.

Since the amount of damage to these potatoes was not extraordinary, but only the normal percentage which might be expected from any shipment, in the last analysis, therefore, it is important to determine whether the damage arose from actual negligence of the claimant or charterer. In brief, were these potatoes "salt damaged" as charged?

The testimony and admissions of libelants' witness Putnam are extremely prejudicial to that contention. He admitted, as indeed seems the fact, that bacteria cause decay in potatoes as in other vegetables, but that salt in itself cannot cause putrefaction.

Then, too, as against the empirical knowledge of libelants, Balish and McCaulay, and the latter's assistant Whitney, is the more persuasive testimony of the bacteriologist Matthews and the chemist Dippel. The former testified that the cause of decomposition of potatoes is attributable, as in the cases of other vegetables, to the presence of bacteria or fungi. The presence of bacteria will break down the tissue; and then we say that the potato is decayed. It seems that the presence of salt will dry a potato and cause it to lose weight, but not to decompose. The chemical analysis of four samples of potatoes from the cargo in question, two of which were mushy and two apparently sound, all showed the same sodium chloride content, .03 of 1 per cent.

Conceding the presence of some salt in the holds, I am obliged to and do find that the damaged potatoes did not result from contact with the salt; nor were they affected by it. In this view of the question of damage, it becomes unnecessary to discuss the matter of deviation of voyage.

Decree for the claimant and the respondent.